[No. D015938. Fourth Dist., Div. One. Feb. 10, 1994.]

TITAN CORPORATION et al., Cross-complainants and Respondents, v. AETNA CASUALTY AND SURETY COMPANY, Cross-defendant and Appellant.

**COUNSEL**

Buchalter, Nemer, Fields & Younger, Randolph P. Sinnott, Cheryl A. Orr and Margo T. Wright for Cross-defendant and Appellant.

Hufstedler, Kaus & Ettinger, Thomas J. Ready, Wiley, Rein & Fielding, Laura A. Foggan, Daniel E. Troy and Steven D. Silverman as Amici Curiae on behalf of Cross-defendant and Appellant.

Gray, Cary, Ames & Frye, Edward J. McIntyre and Robert C. Longstreth for Cross-complainants and Respondents.

**OPINION**

**FROEHLICH, J.**—Respondent the Titan Corporation (Titan) owned a plant in New Jersey (hereafter the Keasbey site or Keasbey facility) that had been operating since 1906. When Titan decided to close the plant in 1985, it began investigating the extent of its environmental cleanup responsibilities under a New Jersey statute. The investigation revealed the site had some forms of pollution.

Titan then purchased a policy of insurance from appellant Aetna Casualty and Surety Company (Aetna). The Aetna policy contained, among other provisions, a "pollution exclusion," which, on first consideration, appears unambiguously to declare that the policy covered neither pollution damages nor cleanup liabilities. Titan nevertheless made a claim on the policy for the costs of cleaning up the Keasbey facility. Aetna denied the claim.

After trial the court below made factual and legal findings which had the net effect of declaring Aetna liable for part of the cleanup costs. On appeal, we are asked to review the policy and its exclusions, and to determine whether the evidence, viewed most favorably in support of the judgment, supports the conclusion the policy applied to the costs incurred by Titan.

I

**BACKGROUND**

A. *The Facility*

For nearly 80 years Titan and its predecessors produced "soft" ferrite at the Keasbey facility. The ferrite manufacturing process produced, as a by-product, waste streams of ferrite sludge. Titan disposed of waste sludge by allowing it to flow into two "infiltration/percolation" lagoons (the I/P lagoons)[1] under permit from the New Jersey Department of Environmental Protection (NJDEP). Titan also placed on the southeastern portion of the site piles of waste materials (i.e., scrap ferrite, old pallets, empty or partially filled drums, etc.). The waste streams and scrap material were classified as

---

[1]The primary contaminants in the waste sludge flowing into the lagoons were fine grain oxides of metal (i.e., ferrite, zinc oxide and ferrite oxide), which metals contaminated the water percolating into the soil.

nonhazardous. "Hazardous" wastes were disposed of off site as required by state and federal regulations.

## B. *The Cleanup*

Titan's decision to close the facility in September 1985 triggered obligations under New Jersey's Environmental Cleanup Responsibility Act (ECRA). (N.J. Stat. Ann., § 13:1K-6 et seq.) ECRA is a strict liability statute requiring the owner to clean up a facility before transferring the property or ceasing operations. To comply with its obligations, Titan retained Dames & Moore as its environmental consultant to investigate the site, perform the required sampling, and prepare a cleanup plan.

The initial site evaluation, submitted to the NJDEP in October 1985, identified a number of areas of contamination.[2] This October 1985 report did not, however, identify "TCE" contamination or groundwater contamination, nor did it identify the dumped brick, concrete, wood or rubbish as "contaminants" for ECRA cleanup.

Following issuance of the October 1985 report, Titan purchased the Aetna policy, effective February 1986. After issuance of the Aetna policy, Titan discovered the so-called "TCE spill area."[3] The TCE contamination was first discovered when groundwater sampling during March and April 1986 revealed TCE contamination of the groundwater, leading to the discovery of TCE contamination of the soil.

Additionally, in June 1986 the NJDEP identified as a "deficiency" certain solid waste piles (i.e., the brick and rubble from demolished buildings, ceramic waste, etc.).[4] The NJDEP required removal of this waste as part of the cleanup operation.

---

[2] Among the areas of contamination identified in this initial 1985 report were the I/P lagoons; the I/P lagoon "overflow area" (an area which contained the same contaminants as the lagoon due to occasional overflow from the lagoons); underground oil storage tanks, which had leaked and contaminated the adjacent soil; an above-ground fuel oil transfer line, which had leaked and caused extensive contamination of the ground along the fuel line; and an area near the "dump" where superficial soil stains suggested that storage drums had leaked.

[3] TCE is the shorthand reference for trichloroethylene, classified as a "hazardous substance" under federal law. (See *Intel Corp.* v. *Hartford Acc. & Indem. Co.* (9th Cir. 1991) 952 F.2d 1551, 1554.) Titan employees denied knowing when or how the contamination occurred, though evidence suggested the TCE was used in "degreasing" operations and then taken outside and "dumped on the ground" by employees.

[4] The trial court found the reason the NJDEP ordered removal of the solid wastes was to prevent them from creating a "sump" effect, which could have facilitated subsequent

The remediation efforts thus entailed cleanup of the I/P lagoons and overflow area, as well as the TCE spill area; removal of the oil storage tanks and excavation of some surrounding soil; excavation of soil along the fuel oil transfer line; soil cleanup around the drum storage area; and cleanup of the solid wastes. Among the areas remediated was a 70-foot-by-15-foot strip of land owned by an adjacent business (the Carborundum land) which had been contaminated by the leaking fuel oil transfer line.

The NJDEP did not require Titan to remediate water below the surface, but it did require preparation of a groundwater remediation contingency plan. Additionally, many of the steps required by the NJDEP (such as cleaning up the TCE, remediation of the I/P lagoons and overflow, cleaning up the oil tank and fuel transfer lines, etc.) represented removal of sources of existing or potential groundwater contaminants.

## C. *The Policy*

Titan made a claim on the Aetna policy for the costs of cleaning up in compliance with the NJDEP requirements at the site. In its letter denying coverage Aetna cited the following reasons for denial: the basic policy terms, the "pollution" exclusion, and the "owned property" exclusion.

The Aetna policy provided for numerous exclusions, two of which are pertinent here. First, its "owned property" exclusion provided:

"This insurance does not apply:

". . . . . . . . . . . . . . . . . . . . . . . .

"(k) to property damage to (1) property owned or occupied by or rented to the insured; (2) property used by the insured . . . ."

---

migration of contaminants into the groundwater. We have searched in vain for any evidence to support this conclusion. Although the June 1986 NJDEP report identified solid wastes for cleanup, it did not indicate any concern the solid wastes posed a threat of creating a "sump." Instead, it merely stated the waste must be sampled for purposes of classification and removed, and further stated that some of the brick might be "furnace" brick with heavy metal contaminants which would require sampling and special handling.

The only reference in that report to a "sump" problem was the NJDEP admonition that some of the waste brick could be crushed and used for backfill in shallow trenches (subject to sampling for heavy metal pollutants), cautioning, however, that it would be inappropriate to use the crushed brick to fill the pits created by the fuel tank excavation because of the concern the pit might act as a sink hole and be a "conduit for any possible future surface spills."

The parties did stipulate that any solid wastes disposed of "on site" were required to be ground up in order to make them compatible with the existing soil, preventing a sump effect. This is *not*, however, the equivalent of stipulating that the *reason* the solid wastes were ordered removed was because their mere presence at the site created a sump effect.

Second, the policy was modified by an endorsement, known as the "absolute pollution exclusion," which provided that the insurance would not apply

"(1) to bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants: (a) at or from premises owned, rented or occupied by the named insured; [or] . . . (c) which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for the named insured . . . .

"(2) to any loss, cost or expense arising out of any governmental direction or request that the named insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants. [¶] Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

## D.  *The Lawsuit*

The action began when one of Titan's insurers, Employers Insurance of Wasau, filed an action seeking a declaration of the various insurers' duties to pay for the cleanup. Aetna became involved on cross-complaint by Titan. Prior to trial, all but two of the insurers settled with Titan. Only Pacific Indemnity Company and Aetna remained as insurers.

In the first phase of the two-phase trial, a jury determined Titan reasonably spent $890,905.42 on the cleanup, a conclusion not disputed on appeal.

Pacific then settled, leaving only Aetna to litigate phase two of the trial involving the question of whether the policy covered the damages. This phase was tried to the court.

The court first concluded the costs were governmentally compelled cleanup costs which (under *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807 [274 Cal.Rptr. 820, 799 P.2d 1253]) constituted "property damages" under a comprehensive general liability policy such as the one issued by Aetna.[5] The court secondly concluded that the "known risk" doctrine (under Ins. Code, §§ 22, 250) was inapplicable, because (1) it was waived for not

---

[5] On appeal, amicus curiae Insurance Environmental Litigation Association (hereafter amicus curiae) argues the cleanup costs did not constitute property damage, and hence the trial

having been raised in the letter denying coverage; (2) some elements of the environmental contamination, such as the TCE spill and the required remediation of the solid wastes, were unknown to the insured until after the policy became effective; and (3) under *Chu* v. *Canadian Indemnity Co.* (1990) 224 Cal.App.3d 86 [274 Cal.Rptr. 20], Titan's knowledge of some problem areas before Aetna's policy period commenced (i.e., the I/P lagoons, etc.) did not charge Titan with knowledge of different problems, to wit, the TCE spill and solid waste cleanup.

The court then ruled that the exclusions were inapplicable. It concluded the pollution exclusion was inapplicable because part of the costs was the removal of solid wastes: the piles of brick, concrete, wood and rubbish. Since the policy defined pollutants as ". . . solid, liquid, gaseous, or thermal irritant[s] or contaminant[s], including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste," and the solid wastes were neither irritants nor contaminants, the court concluded the pollution exclusion did not apply to the costs associated with that portion of the cleanup.

The court also rejected application of the "owned property" exclusion. It pointed to the surface and groundwaters, which qualify as third party property, and which were threatened with or actually contaminated by the I/P lagoons, the TCE spill area, the fuel oil tanks and transfer-line leaks.[6] Perceiving that the costs were incurred to remedy injury to third party property, the court deemed the "owned property exclusion" inapplicable.

court erred in applying *AIU* because under *AIU* the only covered costs are those incurred to comply with cleanups under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) (CERCLA) "and similar statutes." (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 814.) Amicus curiae and Aetna argue on appeal that New Jersey's ECRA statute is *not* a "CERCLA-like" statute because its liabilities are triggered only upon closure or transfer of the site, and any cleanup is not compelled because the only penalty for failure to clean up is voidance of any transfer of the property. The fact that this argument was not raised below is sufficient to deem it waived. (*Younger* v. *State of California* (1982) 137 Cal.App.3d 806, 813-814 [187 Cal.Rptr. 310].) However, even were it appropriate to reach this issue, it would appear the argument is without merit. ECRA *does* provide penalties for noncompliance: fines up to $25,000 per day, and strict liability for the cleanup costs actually incurred (see N.J. Stat. Ann., § 13:1K-13). At least one New Jersey court has interpreted ECRA to allow the transferee to sue the offending owner to recoup the costs incurred for cleaning up the site (see *Dixon Venture* v. *J. Dixon Crucible* (1989) 235 N.J. Super. 105 [561 A.2d 663, 665-666]), much like CERCLA permits third parties to sue the polluter for cleanup costs. (*AIU, supra,* 51 Cal.3d at p. 819.) It thus appears ECRA is "CERCLA-like" in many respects.

[6]The court also found the NJDEP had required the removal of solid wastes to eliminate the sump effect in the groundwater table in order to prevent future contamination of the groundwater. The court apparently misconstrued the stipulated facts, and we can find no evidence to support this conclusion. (See fn. 4, *ante.*)

## II

### ANALYSIS

*A. The Dispositive Issue is Whether Aetna's Policy Covers the Costs Associated With Cleanup of the TCE Spill and Solid Wastes*

Aetna raises numerous contentions on appeal. Before turning to the central issues, however, we may narrow our focus by first eliminating aspects not at the core of the trial court's judgment or of this appeal.

Several of Aetna's appellate arguments focus on the fact Titan was aware of some of the areas of contamination, and of its ECRA obligations to clean up contamination, *before* the inception of Aetna's policy. The evidence clearly shows that several problems (i.e., the I/P lagoons and overflow area, the fuel tanks, the fuel-transfer-line leaks) were in fact known to Titan and had manifested before the policy's inception. Regarding these problems, coverage would be barred under the "manifestation" and "known loss" rules governing insurer's liabilities. (See, e.g., *Pines of La Jolla Homeowners Assn.* v. *Industrial Indemnity* (1992) 5 Cal.App.4th 714, 720-723 [7 Cal.Rptr.2d 53].) The trial court's holding that these "defenses" were waived was based solely on the fact that Aetna's letter denying Titan's claim did not cite the "known loss" statutes. This holding was error. An insurer waives policy defenses only where there has been misconduct or where the failure to raise the defense was detrimentally relied on by the insured. (See *Insurance Co. of the West* v. *Haralambos Beverage Co.* (1987) 195 Cal.App.3d 1308, 1318-1322 [241 Cal.Rptr. 427]; *Intel Corp.* v. *Hartford Acc. & Indem. Co.*, *supra*, 952 F.2d at pp. 1559-1560.) There being no evidence or finding of reliance, the waiver doctrine is inapplicable.

The trial court's error is harmless, however, because the court explicitly premised its judgment on the costs to remedy problems which were *not* "known" or "manifest" at the policy's inception (i.e., the TCE spill and the solid waste disposal), rendering moot its "waiver" finding.[7] Because the trial court found on substantial evidence that the TCE spill and the solid waste disposal were "unknown" prior to Aetna's policy, and Titan's notice of the

---

[7] The error regarding "waiver of non-asserted defenses" is also moot because even if the "known loss" and "manifestation" issues were waived as to the problems known to Titan prior to 1986, these same problems would appear to fall under the policy exclusion which Aetna *did* assert—the pollution exclusion. There is little doubt that cleanup of the I/P lagoons, the fuel oil tank and transfer lines, and the soil around the drum storage area was undertaken to remove "contaminants" threatening the groundwater, within the scope of the pollution exclusion. Thus, even had Aetna waived the "known loss" and "manifestation" issues, it would still prevail under the pollution exclusion.

earlier problems is not equivalent to notice of all problems (*Chu* v. *Canadian Indemnity Co.*, *supra*, 224 Cal.App.3d at p. 98), at least the later problems are not barred by the "known risk of loss" or "manifestation" doctrines.

■ We also doubt the viability of Aetna's argument that the losses were barred as being "expected or intended" from the standpoint of the insured. The trial court found that Titan did not intend or expect to contaminate the site, relying on evidence that Titan handled hazardous materials in accordance with Environmental Protection Agency and NJDEP regulations and that the disposal of sludge into the I/P lagoons was under permit from the NJDEP. Aetna argues, however, that a loss should be deemed intentional if (under an objective standard) the insured knew *or should have known* the loss was a substantially probable consequence of its actions. The "should have known" standard Aetna proffered is without support in California, and the courts in both California and New Jersey have concluded the "expected or intended injury" is not triggered merely because the insured's "should-have-known" injury would be a likely result of his voluntary act.[8] (See *Chu* v. *Canadian Indemnity Co.*, *supra*, 224 Cal.App.3d at p. 99; *Voorhees* v. *Preferred Mut. Ins. Co.*(1992) 128 N.J. 165, 185 [607 A.2d 1255, 1265, 8 A.L.R.5th 937].)

We thus narrow our inquiry to the two central exclusions (i.e., the "pollution" and "property owned" exclusions) and apply them to the costs associated with the TCE spill and the solid waste. We will conclude that except for the strip of adjacent land owned by Carborundum, the only third party property injured was the groundwater. The groundwater contamination, as well as the injury to the Carborundum land, was caused solely by the impact of pollutants. Water contamination from the TCE, the spilled fuel oil, and/or the fine grain metals (i.e., ferrite, zinc oxide, ferrite oxide, etc.) percolated into the soil from the I/P lagoons. All of these are "pollutants, irritants or contaminants" within the meaning of the policy. Additionally, all costs were incurred pursuant to a "governmental direction . . . that the named insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize" such pollutants, irritants or contaminants, within the scope of the "pollution exclusion."

The only materials even arguably outside the clear ambit of the pollution exclusion were the solid wastes (i.e., the wood, bricks, cement, unused ferrite, etc.) which were part of the cleanup. However, to extent these

---

[8]While some federal courts have held the "expected or intended" clause precludes coverage where a business regularly disposed of chemicals that it knew *or should have known* involved a probability of contamination (see, e.g., *American States Ins. Co.* v. *Maryland Cas. Co.* (E.D.Mich. 1984) 587 F.Supp. 1549), such approach is inconsistent with the laws of California and New Jersey which control here.

wastes were outside the "pollution exclusion" because they were not contaminants infecting the groundwater they also were not injurious to third party property. Instead, these wastes represented problems limited to the site, to which portion of the cleanup the "owned property" exclusion applies.

### B. Principles of Insurance Policy Interpretation

■     An insurance policy, like all contracts, is to be interpreted to effectuate the mutual intent of the parties. (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 821.) Where possible, we must look solely to the terms of the policy, and the clear and explicit meaning of the policy terms (understood in their ordinary and popular sense) will govern our interpretation. (*Id.* at p. 822.) If the policy is ambiguous (i.e., susceptible to more than one reasonable interpretation), the ambiguity is construed in favor of coverage. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920].)

However, the predicate to interpreting ambiguities in favor of coverage is that the policy be *reasonably* susceptible to more than one interpretation. Where a policy clearly excludes coverage, we will not indulge in tortured constructions to divine some theoretical ambiguity in order to find coverage. (*City of Laguna Beach* v. *Mead Reinsurance Corp.* (1990) 226 Cal.App.3d 822, 830-831 [276 Cal.Rptr. 438].) An insurer is entitled to limit its coverage to defined risks, and if it does so in clear language, we will not impose coverage where none was intended. (*National Ins. Underwriters* v. *Carter* (1976) 17 Cal.3d 380, 386 [131 Cal.Rptr. 42, 551 P.2d 362].)

The determination of whether a contract is ambiguous is subject to independent review by this court. (*Winet* v. *Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554].) Whether a clause is ambiguous and whether an insured has an objectively reasonable expectation of coverage in light of the insuring language are questions of law. (*Schrillo Co.* v. *Hartford Accident & Indemnity Co.*(1986) 181 Cal.App.3d 766, 775-776 [226 Cal.Rptr. 717].)

### C. The Absolute Pollution Exclusion Unambiguously Excludes Coverage for Costs Associated With Injuries From or Cleanup of the TCE

The language of Aetna's policy endorsement regarding pollution coverage has been described by some courts as an "absolute" pollution exclusion. (See, e.g., *Alcolac Inc.* v. *California Union Ins. Co.* (D.Md. 1989) 716 F.Supp. 1546, 1547.) We are unaware of any California cases holding that a

similarly worded exclusion was ambiguous as to its coverage.[9] However, the courts which have addressed similarly worded exclusions have repeatedly found them unambiguously to exclude coverage for the type of cleanup Titan undertook as to the TCE.[10] (See, e.g., *Guilford Industries Inc.* v. *Liberty Mut. Ins. Co.* (D.Me. 1988) 688 F.Supp. 792, 793-794 [exclusion clear and unambiguous, and applied to oil spill]; *Bureau of Engraving* v. *Federal Ins. Co.* (D.Minn. 1992) 793 F.Supp. 209, 211-212 [absolute pollution exclusion clear and unambiguous, and applied to hazardous wastes causing soil and water contamination].)

Titan commendably does not attempt to argue that TCE, a hazardous chemical under federal law (see *Intel Corp.* v. *Hartford Acc. & Indem. Co.*, *supra*, 952 F.2d at p. 1554), is not an "irritant" or a "contaminant," or that the language of the policy exclusion could reasonably be interpreted so that the costs of the TCE cleanup would fall outside the exclusion. Titan instead argues that while the exclusion might well apply to the TCE, it does not unambiguously exclude coverage for the solid wastes.

The relevant policy language may be ambiguous on whether solid wastes (the scrap ferrite, brick, rubble, wood debris, etc.) fall within the exclusionary language. The policy defines "pollutants" as "any solid . . . *irritant or contaminant*, including . . . waste. Waste includes materials to be recycled, reconditioned or reclaimed." (Italics added.) Titan seizes the highlighted language to argue that debris, although both "solid" and "waste," is neither an irritant nor a contaminant, and Titan lists cases holding that not all "wastes" necessarily fall within the pollution exclusion.[11] Aetna and amicus curiae argue, on the other hand, that the term "waste" is not limited to

---

[9]The California cases cited by Titan are inapposite. In *Pepper Industries, Inc.* v. *Home Ins. Co.* (1977) 67 Cal.App.3d 1012 [134 Cal.Rptr. 904] the court questioned the applicability of the "pollution exclusion" because the injury was caused not by "pollution" but by an explosion and fire resulting from the spilled gasoline. (*Id.* at pp. 1018-1019.) Again, the court in *Brian Chuchua's Jeep, Inc.* v. *Farmers Ins. Group* (1992) 10 Cal.App.4th 1579 [13 Cal.Rptr.2d 444] questioned whether the efficient proximate cause of the injury was an earthquake (a covered peril) or the resultant leak of pollutants (an excluded peril). (*Id.* at p. 1582.) We are not faced here with issues of multiple causes, the only injury being the contamination and costs therefrom. Neither *Pepper Industries* nor *Brian Chuchua's Jeep* provides any guidance.

[10]The fuel oil and I/P lagoon problems would also appear to be clearly within the pollution exclusion.

[11]Titan cites an impressive list of cases which have rejected a mechanistic approach to whether a given substance is or is not an "irritant," "contaminant" or "pollutant" under the exclusionary clause. (See, e.g., *Westchester Fire Ins.* v. *City of Pittsburg, Kan.* (D.Kan. 1991) 768 F.Supp. 1463 [malathion is an irritant but not a pollutant because the average person would understand pollutant as a substance which permanently degrades environment].) Instead, these courts have adopted a more commonsense approach to whether a substance is a pollutant within the intended scope of an exclusionary clause. (See, e.g., *Pipefitters Welfare*

"hazardous" waste, but is broadly used. Aetna argues that because the waste removal here was part of a government-compelled cleanup, and the policy excludes any "expense[s] arising out of any governmental direction or request that the named insured . . . clean up, remove, contain, treat, detoxify or neutralize pollutants," the waste is within the exclusionary clause.

Here, we may presume Titan to be correct in asserting that the solid waste was not a contaminant nor was it cleaned up to prevent a "threatened discharge, dispersal, release or escape of pollutants." However, assuming the solid waste did not threaten to contaminate the groundwater or any other third party property, the only property injured by the presence of the waste was the Keasbey site itself. On that assumption, the solid waste comes within the "owned property" exclusion, to which we now turn.

### D. *The Owned Property Exclusion Precludes Recovery for Costs to Remove Solid Wastes Which Injured Only the Insured's Property and Not Third Party Property*

The solid wastes were situated solely on the Keasbey site. While the presence of solid· wastes on the site may have damaged the insured's property, it appears to have caused no actual injury to third party property. The Aetna policy provided: "This insurance does not apply: . . . (k) to property damage to (1) property owned or occupied or rented to the insured; (2) property used by the insured. . . ." The solid waste removal falls within this exclusion.

Titan seeks to preserve the judgment by arguing that because groundwater represents third party property, the courts have refused to apply the "owned property" exclusion where the groundwater was contaminated. (See *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 817, fn. 6 [contamination of groundwater is injury to third party property].) There is no evidence, however, that the groundwater contamination here emanated from any source other than the TCE spills (excluded under the pollution exclusion) and/or the I/P lagoons or fuel oil tank and transfer spills (excluded under both the pollution exclusion and the known risk and prior manifestation rules). Instead, the cleanup of the solid wastes was to remedy a problem distinct from the conditions causing injury to third parties.[12]

Titan relies on numerous cases as holding that if there is existing contamination, efforts to clean up the site fall outside the owned property exclusion.

*Educ. Fund* v. *Westchester Fire* (7th Cir. 1992) 976 F.2d 1037, 1043-1044 [deciding "PCB" discharge is a pollutant].) Though these cases are interesting, they provide no guidance here, because none has addressed whether solid wastes are pollutants.

[12]The trial court's findings are in accord. The court found that "the cleanup activity . . . was undertaken in order to remedy existing groundwater . . . pollution, as well as contamination of adjacent properties, and to prevent further contamination of these areas. The TCE

These cases are inapposite, because they invariably concluded the "owned property" exclusion did not apply where there was existing contamination damage to third parties *and* the cleanup costs were incurred to ameliorate actual injury *and to prevent the contaminants from continuing to injure or threaten third parties.*[13] Thus in *Intel Corp.* v. *Hartford Acc. & Indem. Co., supra,* 952 F.2d 1551, the court concluded that costs incurred by the insured in cleaning up groundwater contamination constituted damages to third parties. However, the *Intel* court cautioned that not every cost incurred under the consent decree is automatically covered, because some of those costs related solely to cleaning up the insured's property and fell within the "owned property" exclusion, whereas other costs were incurred to remedy extant and future harm to third parties from existing contaminants. (*Id.* at pp. 1565-1566.) Similarly, in *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d 807 the court held that cleanup costs for existing damage are recoverable, but that ". . . prophylactic costs—incurred to pay for measures taken in advance of any release of hazardous waste . . ." are not covered. (*Id.* at p. 843.) The courts of New Jersey are in accord. In *State* v. *Signo Trading Intern., Inc.* (N.J. 1992) 130 N.J. 51 [612 A.2d 932], the court held a policy did not cover prophylactic costs (i.e., costs incurred to clean up the insured's property to prevent future harm) where such remediation was not shown to be aimed at preventing imminent, continuing harm from an existing injurious source. (*Id.* at pp. 938-940.)

■ The courts of California and New Jersey, as well as their federal counterparts, have excluded from coverage measures taken to prevent future

---

spill, the I/P lagoon area, the drum storage area, the underground storage tanks and adjacent soil and the soil contaminated by the fuel oil transfer line were *all remediated to remove sources of existing and/or potential contamination* of groundwater. The NJDEP also required that any solid waste disposed of at the site be ground up to be compatible with the soil, so that it would not cause a sump effect in the groundwater table. The NJDEP was also concerned that the nonpollutants at the site would form a conduit for contamination at the site, leading to further contamination of groundwater. The fact that no actual treatment of the groundwater itself was required is irrelevant, since the evidence clearly shows that contamination did exist, and that the cleanup was motivated by the NJDEP's desire to prevent further contamination." (Italics added.) As the highlighted language shows, the trial court found the cleanup *of the pollutants* was done to remediate existing and potential future contamination. The NJDEP's requirement of trash cleanup is irrelevant to the pollution issue.

[13]Titan cites what it characterizes as "an unbroken line of authority" holding that the existence of groundwater contamination renders the "owned property" exclusion inapplicable. (See, e.g., *Gloucester TP.* v. *Maryland Cas. Co.* (D.N.J. 1987) 668 F.Supp. 394, 400 [owned property exclusion inapplicable because contamination was extant and cleanup was designed to remedy existing injury and halt ongoing contamination].) Titan's citations are impressive in number but irrelevant in content. None of those cases purports to hold that once third party property is injured any and all costs of site cleanup are outside the exclusion *regardless of their connection to the polluting source.* California law is contrary to the approach urged by Titan. (See, e.g., *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 758 [15 Cal.Rptr.2d 815] [burden on insured to show each component of CERCLA cleanup is to remedy third party property damage within comprehensive general liability coverage].)

contamination, as distinct from those steps taken to abate continuing harm from extant sources of contamination. In applying those guidelines here, the facts demonstrate the solid waste cleanup is outside the coverage afforded by the Aetna policy. First, as discussed above (see fn. 4, *ante*), the rubble cleanup was not ordered because it was causing continuing groundwater injury. Instead, the NJDEP simply ordered Titan to sample, properly classify and dispose of solid wastes. Second, to the extent there was evidence the NJDEP had environmental concerns about the solid wastes per se, it was because some of the debris might have been "furnace" brick, which could potentially contain heavy metals such as chromium or cadmium, requiring additional cleanup. If this was the basis for the cleanup, then the "pollution exclusion" was applicable to that part of the cleanup.

Finally, the only evidence of any concern that the rubble might create a "sump effect" on the groundwater table was the admonition that the crushed brick not be disposed of in the deep pit excavations, because "the crushed brick . . . is expected to have a much higher permeability than the replaced soils [which] would result in the rapid accumulation of water in a subsurface sink . . . and act as a conduit for any possible future surface spills [to the groundwater table]." This evidence reveals two fatal flaws in Titan's argument in favor of coverage: (1) It shows the "threat to groundwater" was posed *not* by the solid wastes per se but *by the proposed disposal method* for some of those wastes; and (2) it shows the "threat to groundwater" related to "any possible future surface spills"—precisely the type of prophylactic cost uniformly found excluded by the courts.

In short, Titan's efforts to avoid the exclusions rest on a "Catch-22" argument—that is, the solid wastes were not contaminants (thus avoiding the pollution exclusion), but were remediated because of their contamination of third party property (thus avoiding the owned property exclusion). Titan cannot have it both ways. There is no coverage for the solid waste disposal.

### E. The Personal Injury Endorsement Does Not Negate the Policy Exclusion for Property Damage Caused by Pollution

Titan also seeks refuge in the "personal injury" coverage, which covers injuries arising out of, among other things, the "wrongful entry or eviction or other invasion of the right of private occupancy." The trial court held, in a footnote to its primary opinion, that "the expenses constitute sums which Titan is obligated to pay because of 'personal injury,' and fall within that coverage as well since they were incurred because of a wrongful entry or eviction or invasion of the right of private occupancy."

The trial court's approach violates basic principles of contract interpretation. We interpret contracts (including insurance policies) as a whole,

with each clause lending meaning to the others. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co., supra,* 41 Cal.3d 903, 916.) Importantly, we should interpret contractual language in a manner which gives force and effect to every clause rather than to one which renders clauses nugatory. (*New York Life Ins. Co.* v. *Hollender* (1951) 38 Cal.2d 73, 81-82 [237 P.2d 510] [rejecting insured's interpretation of an "incontestability" clause because it would effectively nullify other clauses unambiguously permitting age adjustment].) ▆▆▆ The policy here unambiguously declares it will not pay for either bodily injury or property damage when the cause of such injury or damage is pollution. Under the interpretation urged by Titan and adopted by the trial court, *that exclusion will never operate,* because the pollution exclusion's "property damage" provisions are relevant *only* to eliminate liability for third party property injury. However, under the trial court's interpretation, such injury would simply be relabeled as an "other invasion of the right of private occupancy," rendering the pollution exclusion a dead appendage to the policy.

We interpret the coverage afforded by the personal injury portion of the policy as being limited to damages *other* than the injury to realty which an occupier of land may suffer when his quiet enjoyment of occupancy is disturbed. (Accord, *Nichols* v. *Great American Ins. Companies* (1985) 169 Cal.App.3d 766, 775-776 [215 Cal.Rptr. 416].) In *Waranch* v. *Gulf Insurance Co.* (1990) 218 Cal.App.3d 356 [266 Cal.Rptr. 827] the court interpreted a similar "personal injury" clause as a whole and concluded, under principles of *ejusdem generis,*[14] the policy applied to wrongful evictions, entries or other similar violations of quiet occupancy. (*Id.* at pp. 359-361.)

Courts in other jurisdictions have also interpreted this clause to limit its coverage to injuries personal to the occupant, as distinct from the damage to the realty. (See, e.g., *Leek* v. *Reliance Ins. Co.* (Fla.Dist.Ct.App. 1986) 486 So.2d 701, 704 [personal injury coverage does not protect against property damages caused by the insured]; *Inland Constr. Corp.* v. *Continental Cas. Co.* (Minn. 1977) 258 N.W.2d 881, 885 ["coverage [is] for personal injuries and not property damage"].) Numerous courts have rejected precisely the argument advanced by Titan here. In *O'Brien Energy* v. *American Employers'* (Pa.Super. Ct. 1993) 629 A.2d 957, for example, the insured attempted to avoid a pollution exclusion by claiming coverage under an "other invasion" clause of the personal injury endorsement. The court roundly rejected the argument, pointing out: "The personal injury endorsement extends liability coverage to the specific torts there enumerated. . . . These include

---

[14]*Ejusdem generis* instructs that where general words follow a specific enumeration, the general words should not be construed in their broadest sense but should be read as applying to the same general class of things as the specifically enumerated things. (Black's Law Dict. (4th ed. 1968) p. 608, col. 1.)

torts of a recognized type involving damages which can be lumped under the descriptive term 'personal injury.' The coverage does not provide indemnification for environmental damage claims . . . . Coverage for such claims is specifically excluded by the pollution exclusion. *To hold otherwise would emasculate the clear and unambiguous provisions of the pollution exclusion and could not be justified except as an unwarranted straining to reach a result different [from] that intended by the parties.*" (*Id.* at p. 964, italics added.)

Other courts have similarly refused to find coverage for pollution damage to property under the rubric of an "other invasion" clause of a personal injury endorsement because such approach would render the pollution exclusion meaningless. (See *County of Columbia v. Continental Ins.* (1993) 189 A.D.2d 391 [595 N.Y.S.2d 988, 991]; *Gregory v. Tennessee Gas Pipeline Co.* (5th Cir. 1991) 948 F.2d 203, 209.)

We acknowledge that some federal courts have construed the "personal injury" clause to cover pollution damage. In *Titan Holdings Syndicate, Inc. v. City of Keene, N.H.* (1st Cir. 1990) 898 F.2d 265, a landowner adjoining a city sewage treatment plant alleged that the plant's light, noise and fumes interfered with his right to quiet enjoyment. (*Id.* at p. 267.) The court first held the "light and noise" problems were not within the definition of "pollutants," and hence the pollution exclusion was inapplicable to those aspects of the complaint. (*Id.* at p. 269.) The *Titan Holdings* court then held that the noxious fumes were an "other invasion of the right of private occupancy," within the personal injury coverage. (*Id.* at pp. 272-273.) We are unpersuaded by this aspect of *Titan Holdings*, because it violated two central interpretive canons: It ignored that such a holding effectively negates the pollution exclusion, and it overlooked *ejusdem generis* principles, which caution that the "other invasion" should be interpreted to mean the functional equivalent of "wrongful entry or eviction."

Titan also relies on *Pipefitters Welfare Educ. Fund v. Westchester Fire*, *supra*, 976 F.2d 1037, in which the insured sold a machine to a third party (Arst); the machine contained hazardous chemicals which spilled on Arst's property, causing, among other problems, Arst's loss of access to the premises for a period of time. Relying in part on *Titan Holdings*, the court concluded the insurer had a duty to defend because Arst's lawsuit might fall within the "other invasion of the right to private occupancy." (*Id.* at pp. 1041-1042.) *Pipefitters* does not assist Titan here, because *Pipefitters* decided only the "duty to defend" issue, not the distinct "duty to indemnify" question we address here.[15]

More importantly, to the extent the holding in *Pipefitters* was intended to declare that *any* injury to property is *also* an "other invasion" of a right of

---

[15]The distinction is significant because the *Pipefitters* court expressly did not reach the issue of whether the insurer would be required to *indemnify* the insured, since it recognized

occupancy, we disagree. ██ We must examine the language in context to determine whether an insured would have an objectively reasonable expectation of coverage. (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) ██ The term "other invasion of the right of private occupancy" draws meaning and content from the preceding language: "wrongful entry or eviction." Such language connotes disruptions of the ability of a landowner to actually occupy his property, not mere injuries to property. (See *County of Columbia* v. *Continental Ins., supra*, 595 N.Y.S.2d at p. 991.) ██ In brief, we do not believe it is objectively reasonable for an insured to expect "personal injury" to mean "property damage," or to expect contamination of ground-water to harm either a "private" right or an "occupancy" right, or to expect that a blanket pollution exclusion will never operate.

## DISPOSITION

The judgment is reversed. The trial court is directed to enter judgment in favor of Aetna in accordance with the views expressed in this opinion. Titan shall bear costs on appeal.

Work, Acting P. J., and Huffman, J., concurred.

---

that such question depended on ". . . the type of relief, if any, ultimately obtained in Arst's suit." (*Pipefitters Welfare Educ. Fund* v. *Westchester Fire, supra*, 976 F.2d at p. 1042.) Since the court recognized that a pollution exclusion (contained in another insurer's policy) *would* bar recovery for any property damage caused by the release of the pollutants (*id.* at pp. 1043-1044), it left open the possibility that the "personal injury" coverage would not encompass indemnification for property damage caused by the pollution.