Opinion
 

 ALDRICH, J.
 

 Introduction
 

 In this case we are called upon to examine the scope of “personal injury” coverage contained in a general liability policy issued to the insured in the context of an action against the insurers for breach of contract and breach of the covenant of good faith and fair dealing.
 
 [1]
 
 The trial court granted summary judgment in favor of the insurers and against the insured, finding the “personal injury” coverage inapplicable to what is, in essence, a breach of contract action. We agree and affirm the trial court.
 

 
 *190
 
 Factual and Procedural History
 

 The contractual relationships of the parties.
 

 Appellant, Wilmington Liquid Bulk Terminals, Inc. (Wilmington) is a company which provides warehouse and docking facilities at the port of Los Angeles. Wilmington entered into a contract with National Cement Company of California, Inc. (National Cement) whereby Wilmington would obtain all permits for and construct a dock suitable for use by National Cement for loading and unloading of cement products. Wilmington failed to obtain the necessary permits including environmental permits, and therefore the dock was never constructed.
 

 The litigation between National Cement and Wilmington.
 

 In April 1990, Wilmington was sued by National Cement for damages resulting from an alleged breach of contract. National Cement’s complaint contained three causes of action, all based upon the same facts, which were set out as “general allegations,” and incorporated into the three causes of action. The first cause of action sought rescission of its contract, the second sought damages for breach of contract, and the third alleged that there was a breach of the covenant of good faith and fair dealing.
 

 Two years later, National Cement amended its complaint. Attached to both the original and the first amended complaints is a copy of the “Terminal Service Agreement,” the contract which was the subject of National Cement’s lawsuit. The contract provided that Wilmington would construct facilities for the handling and storage of cementitious materials on property leased by Wilmington from the Port of Los Angeles.
 
 [2]
 
 National Cement was to have no title to or interest in the facility at any time. The cost of construction was to be paid by Wilmington, and reimbursed by National Cement in the form of an “annual charge” computed according to a specified formula. With regard to permits, the contract provides: “Performance of this Agreement shall be subject to obtaining all necessary [environmental] permits, licenses, approvals, and rights-of-way (including, but not limited to, environmental approvals) which may be required from any governmental body or any other party with respect to the construction or installation of the Facility within one (1) year from the date hereof”; and, “The cost of the Facility shall include . . . approvals, permits, licensing, inspection and development fees . . . .” In addition, if at any time there was a change in
 
 *191
 
 any environmental law or regulation imposing new requirements, Wilmington was obligated to notify National Cement, and “work in good faith to comply with such requirements.”
 

 The first amended complaint was based upon the same basic facts as the original complaint, but National Cement added thirty new paragraphs of evidentiary facts detailing the parties’ negotiations, correspondence, and accusations, as well as six new causes of action, including two causes of action for negligence. Gleaned from an exhaustive list of evidentiary details relating to the alleged negligence, the essence of the contentions appears to be the same as those underlying the breach of contract: that Wilmington negligently delayed the project, failed to obtain all necessary permits within a reasonable time, and incurred unauthorized expenses. The result of the failure was “to frustrate the purpose of the terminal project,” with the implication that the terminal was never built or made ready to operate. The cause of action for breach of contract and the tort causes of action each sought $18 million in damages. Other than the similarity in the figure, it cannot be determined from the pleading whether it is the same damage in each cause of action.
 

 The insurance policies.
 

 From June 22, 1986, to June 22, 1988, Wilmington was insured by Somerset. After June 22, 1988, Wilmington was insured by Wilton. The Somerset policy was a general liability policy to cover the “legal . . . liability” of the insured, including coverage “[f]or all sums for which [Wilmington] shall become obligated to pay (a) as damages because of. . . personal injury . . . ; (b) as damages for the loss of use of the property of others as well as damages because of injury to, loss of, or destruction of, the property of others. ...” The definition of “personal injury” under the policy includes the offense of “wrongful entry or eviction, or other invasion of the right of private occupancy” when committed in the course of conducting the insured’s business. The Wilton policy was also a general liability policy, by which the insurers agreed “to pay on behalf of the Insured, liabilities to others which the insured may incur,” resulting from personal injury and “physical loss of or damage to the property ... of others.” Personal injury was defined as “wrongful entry or eviction or other invasion of the right of private occupancy,” among other things. Both policies included the cost of defending any lawsuit based upon a covered liability.
 

 Somerset denied coverage, and Wilton requested more information from the insured. Wilton claims not to have received any response or to have
 
 *192
 
 heard of the matter further until after the underlying lawsuit was settled. After National Cement and Wilmington settled their lawsuit, this action was filed against the insurers. Somerset and Wilton filed separate motions for summary judgment on September 29, 1995, which were granted on October 27, 1995. Judgment was thereafter entered in favor of the insurers and against Wilmington, which filed its notice of appeal on December 21, 1995.
 

 Issues on Appeal
 

 Recognizing that its general liability insurance policy did not provide coverage for damages caused by its own breach of contract, Wilmington contends there was a potential for coverage, requiring its insurers to defend it in the National Cement action, because there were allegations of negligent breach, and because the duty breached was not a term of the National Cement contract, but an act voluntarily undertaken by Wilmington. Wilmington also contends that its liability to National was potentially covered under the personal injury and property damage provisions of the insurance policies. Other contentions by Wilmington would require discussion only if we found a duty to defend. As we do not, we do not address them here.
 

 Discussion
 

 1.
 
 Standard of review.
 

 A motion for summary judgment “shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” (Code Civ. Proc., § 437c, subd. (c).) On appeal from an order granting a motion for summary judgment, the reviewing court conducts a de novo examination of the record to determine whether the reviewing party is entitled to summary judgment as a matter of law or whether genuine issues of material fact remain.
 
 (Preach
 
 v.
 
 Monter Rainbow
 
 (1993) 12 Cal.App.4th 1441, 1450 [16 Cal.Rptr.2d 320];
 
 Krieger
 
 v.
 
 Nick Alexander Imports, Inc.
 
 (1991) 234 Cal.App.3d 205, 212 [285 Cal.Rptr. 717].)
 

 2.
 
 No duty to defend.
 

 An insurer’s duty to defend and indemnify is measured by the nature and kind of risks covered by the policy.
 
 (Insurance Co. of the West
 
 v.
 
 Haralambos Beverage Co.
 
 (1987) 195 Cal.App.3d 1308, 1316 [241 Cal.Rptr. 427].) An insurance policy is interpreted, like all contracts, to effectuate the mutual intent of the parties.
 
 (AIU Ins. Co.
 
 v.
 
 Superior Court
 
 (1990) 51 Cal.3d 807, 821 [274 Cal.Rptr. 820, 799 P.2d 1253].) The interpretation
 
 *193
 
 of an insurance policy is a question of law, determined, if possible, solely from the terms of the policy and their clear and explicit meaning (understood in their ordinary and popular sense).
 
 (Waller
 
 v.
 
 Truck Ins. Exchange, Inc.
 
 (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619];
 
 Titan Corp.
 
 v.
 
 Aetna Casualty & Surety Co.
 
 (1994) 22 Cal.App.4th 457, 469 [27 Cal.Rptr.2d 476].)
 

 Wilmington recognizes that the subject policies, like most general liability policies, cover tort liability, not liability based upon an alleged failure to perform a contract. (See
 
 Bernstein
 
 v.
 
 Consolidated American Ins. Co.
 
 (1995) 37 Cal.App.4th 763, 771-772 [43 Cal.Rptr.2d 817];
 
 Insurance Co. of the West
 
 v.
 
 Haralambos Beverage Co., supra,
 
 195 Cal.App.3d at p. 1317;
 
 Fireman’s Fund Ins. Co.
 
 v.
 
 City of Turlock
 
 (1985) 170 Cal.App.3d 988, 995 [216 Cal.Rptr. 796];
 
 International Surplus Lines Ins. Co.
 
 v.
 
 Devonshire Coverage Corp.
 
 (1979) 93 Cal.App.3d 601, 611 [155 Cal.Rptr. 870].) Wilmington argues, however, that the allegations contained in National Cement’s first amended complaint sound in tort not contract, and there is therefore a potential for coverage. For the reasons we now discuss we reject Wilmington’s assertion.
 

 Courts have interpreted policy language covering sums the insured becomes “legally obligated to pay” and “damages for a liability imposed by law” as referring to tort liability, because it describes liability based upon a breach of a duty imposed by law, rather than by contract. (See
 
 Fireman’s Fund Ins. Co.
 
 v.
 
 City of Turlock, supra,
 
 at p. 995;
 
 International Surplus Lines, Ins. Co.
 
 v.
 
 Devonshire Coverage Corp., supra,
 
 at p. 611.) The Somerset policy provides coverage for “legal liability.” That phrase is arguably synonymous with “legally obligated to pay,” and therefore refers to tort liability. The Wilton policy contains no similar language, but Wilmington does not contend that it was intended to cover liabilities arising from a breach of contract.
 

 Wilmington does contend, however, that because the original National Cement lawsuit included allegations of negligence, and the first amended complaint added causes of action in negligence, that there was potential tort liability which gave rise to coverage under the policies. Wilmington argues that when an insured has undertaken to perform a contractual duty, it becomes a legal duty to do so in a way that is not tortious; therefore, a negligently performed contractual duty would give rise to coverage. By contrast, Wilmington argues, the total failure to perform a contractual duty remains just a breach of contract, and does not give rise to coverage.
 

 Wilmington relies, in part, upon
 
 Aim Insurance Co.
 
 v.
 
 Culcasi
 
 (1991) 229 Cal.App.3d 209, 215-216 [280 Cal.Rptr. 766], in which an employee suffered damages when her employer, Culcasi, failed to forward her enrollment
 
 *194
 
 in the employer’s health plan to the insurance company, after
 
 volunteering
 
 to do so. Coverage was found under Culcasi’s liability policy because “ ‘a person may become liable in tort for negligently failing to perform a voluntarily assumed undertaking even in the absence of a contract so to do.’ ”
 
 (Id.
 
 at p. 215.) Wilmington quotes the following language in
 
 Culcasi:
 
 “That Culcasi
 
 may or may not also have had a contractual
 
 duty to send [the employee’s] health plan application to the insurer is
 
 irrelevant,
 
 for his duty to perform it with reasonable care independently arose when he volunteered to do it.”
 
 (Id.
 
 at p. 216, fn. omitted, italics added, original italics.) Although the duty which Culcasi breached was not contractual, but voluntarily assumed, Wilmington’s argument relies in great measure on the language in italics to argue that the existence of a contractual duty is irrelevant in determining coverage, where the insured has undertaken to act, and acts tortiously. Therefore, it argues, whether Wilmington had a contractual duty in the underlying matter to obtain environmental permits is irrelevant; what is relevant is that it “undertook the responsibility” to obtain the permits. We disagree. Where the sole basis of the insured’s potential liability is a claim that the insured breached a contractual duty, it cannot be transformed into a breach of a duty imposed by law simply by an allegation that the breach was also tortious or, as in this case, negligent. (Cf.
 
 Insurance Co. of the West
 
 v.
 
 Haralambos Beverage Co., supra,
 
 195 Cal.App.3d 1308, 1317 [fraud in the inducement];
 
 International Surplus Lines Ins. Co.
 
 v.
 
 Devonshire Coverage Corp., supra,
 
 93 Cal.App.3d at p. 612 [negligent breach].)
 

 In the alternative, Wilmington claims that it did not act under a contractual duty, and asks that we consider the finding of the mediator in the National Cement action to show that it voluntarily undertook to obtain permits, bringing it within the holding of
 
 Culcasi.
 
 At the request of the parties to the mediation, the mediator signed a lengthy opinion in which he “found” that the contract did not require Wilmington to obtain permits. However, the duty of an insurer to defend an action brought against the insured turns on what facts were known by the insurer at the inception of the lawsuit.
 
 (Montrose Chemical Corp.
 
 v.
 
 Superior Court
 
 (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153];
 
 Gray
 
 v.
 
 Zurich Insurance Co.
 
 (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168].) Wilmington does not contend that there were facts outside the National Cement pleadings which the insurers should have considered in accepting or rejecting its tender of defense. In the National Cement complaints, the
 
 same facts
 
 underlay both the breach of contract cause of action and the tort causes of action. It can be fairly inferred from the agreement between National Cement and Wilmington that Wilmington bore the responsibility to obtain environmental permits, since it was to construct the facility, pay for permits, and retain all title to the
 
 *195
 
 facility. The performance of an implied term in the contract cannot be characterized as a voluntary act, as opposed to a contractual duty. Even if we were to view obtaining permits as a wholly voluntary act, the negligent performance of it resulted in no more than the failure of Wilmington to perform the express terms of the contract: the same result that would be occasioned by a failure to perform the contract altogether. Cases relied upon by Wilmington in which the negligent breach caused damages such as property damage or personal injury, are inapposite. (See, e.g.,
 
 Ritchie
 
 v.
 
 Anchor Casualty Co.
 
 (1955) 135 Cal.App.2d 245 [286 P.2d 1000];
 
 Eichler Homes, Inc.
 
 v.
 
 Underwriters at Lloyd’s, London
 
 (1965) 238 Cal.App.2d 532 [47 Cal.Rptr. 843].)
 

 3.
 
 No coverage under the personal injury or property damage provisions of the policies.
 

 Wilmington contends, however, that the damage claimed by National Cement did arguably result from personal injury or property damage.
 
 [3]
 
 The definition of personal injury in the Somerset and Wilton policies included wrongful entry or eviction, or other invasion of the right of private occupancy. Wilmington does not contend that National Cement was wrongfully evicted or that there was an unlawful entry, but argues that the failure to obtain permits should be interpreted as an invasion of the right of private occupancy, because it prevented it from using the proposed cement facility as it wished. Wilmington suggests that because the term, “other invasion of the right of private occupancy,” has been held to be ambiguous, and ambiguous policy language should be construed in such a way as to protect the reasonable expectations of the insured, we should adopt its interpretation. (See
 
 Montrose Chemical Corp.
 
 v.
 
 Admiral Ins. Co.
 
 (1995) 10 Cal.4th 645, 667 [42 Cal.Rptr. 324, 913 P.2d 878].) However, the rule of construing ambiguities against the insurer protects only the
 
 objectively
 
 reasonable expectations of the insured.
 
 (Bank of the West
 
 v.
 
 Superior Court
 
 (1992) 2 Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) Furthermore, a finding of ambiguity cannot be made in the abstract, without regard to the particular insurance policy and circumstances.
 
 (Ibid.)
 

 “Occupancy” means having possession, which in turn, requires having control over a thing. (See
 
 Nathan
 
 v.
 
 Dierssen
 
 (1905) 146 Cal. 63, 66 [79 P. 739].) Nowhere did National Cement allege in its very detailed complaints that there was an interference with the use of real property which it had ever
 
 *196
 
 occupied or possessed. Although it was never directly alleged in the pleadings, it was implied that the terminal was never built and never used by National Cement. The “invasion” was no more than an interference with an expectancy of future use of the terminal under an executory contract which did not convey an interest in real property. Courts generally interpret the coverage clauses of insurance policies broadly
 
 (AIU Ins. Co.
 
 v.
 
 Superior Court, supra,
 
 51 Cal.3d at p. 822), but will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.
 
 (Reserve Insurance Co.
 
 v.
 
 Pisciotta
 
 (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].) “Occupancy,” as used in this policy, considering the National Cement pleadings, is not ambiguous, and is not susceptible to meaning National Cement’s expectation of using the terminal once constructed under its executory contract with Wilmington.
 

 Wilmington compares the failure to obtain environmental permits with the “invasion of the right of occupancy” found in a federal case and a New Hampshire case. (See
 
 Town of Goshen
 
 v.
 
 Grange Mut. Ins. Co.
 
 (1980) 120 N.H. 915 [424 A.2d 822, 823];
 
 American States Ins. Co.
 
 v.
 
 Canyon Creek
 
 (N.D.Cal. 1991) 786 F.Supp. 821, 828-829.) In
 
 Town of Goshen,
 
 the insured municipal planning board delayed the approval of a subdivision application, preventing the applicant from using his property as planned. In
 
 American States,
 
 the insured led purchasers of mobilehomes to believe that they had the right to own and occupy the real property on which the mobilehomes were located. The invasion in each case was not a physical one, but a legal or regulatory obstacle to the use of real property. Wilmington contends that National Cement’s claim was an invasion of the same kind, because its failure to obtain the proper permits, destroying the viability of the project, interfered with the “intended use of its property.”
 

 National Cement’s claim is readily distinguishable from the cases upon which Wilmington relies. In the
 
 Town of Goshen,
 
 the subdivision approval delay interfered with the intended use of real property
 
 then owned
 
 by the existing landowner. Here, the National Cement agreement expressly provided that it would have no interest in the facility, and its allegations make it clear that it never occupied the facility. Although the mobilehome buyers in
 
 American States
 
 did not own or occupy real property, the decision has been rationalized in one California court by characterizing the interference as “a variant of . . . wrongful eviction and entry,” apparently because the buyers were not able to occupy their mobilehomes, which were located on real property. (See
 
 Fibreboard Corp.
 
 v.
 
 Hartford Accident & Indemnity Co.
 
 (1993) 16 Cal.App.4th 492, 512 [20 Cal.Rptr.2d 376].) We do not agree that the federal court’s holding in
 
 American States
 
 can be so rationalized, and do not find it persuasive.
 

 
 *197
 
 4.
 
 No coverage under the property damage provisions for the “loss of use” of the terminal.
 

 Having found that there was no potential for coverage under the personal injury provision of the policies, we turn to Wilmington’s contention that there was potential coverage under the property damage provisions for the “loss of use” of the terminal. Both the Somerset and the Wilton policies provided coverage for damages resulting from the loss of use of the property
 
 of others.
 
 Wilmington contends that the National Cement pleadings allege a loss of
 
 National Cement’s
 
 property, based upon the following language in the National Cement agreement: “Except as provided herein, this Agreement shall be on the same terms and conditions as contained in the Lease [between Wilmington and the port of Los Angeles] .... Unless otherwise stated, the terms used herein shall have the same meaning as in the Lease. [National Cement’s] rights pursuant to this Agreement are subject and subordinate at all times to the Lease. [National Cement] expressly assumes all obligations, agrees to perform all covenants, and agrees to be bound by all restrictions which are set forth in the Lease ... in the same manner as these obligations, covenants and restrictions are binding upon [Wilmington] as Tenant under the Lease, except as expressly modified by this Agreement. [National Cement] shall have all rights of [Wilmington] as Tenant under the Lease, except the right to renew (if any), and [Wilmington] shall have all rights of Landlord under the Lease.” National Cement was, Wilmington argues, “essentially a sub-lessee,” in a landlord-tenant relationship with Wilmington.
 

 The Wilmington/National Cement agreement was approximately 22 pages long, and stated that the facility to be constructed by Wilmington would be for the exclusive
 
 use
 
 of National Cement. After the construction of the facility, Wilmington was to provide specified services, such as handling, storage, and cleaning. The agreement states: “Subject to the rights granted to [National Cement] for use of the Space under Section 1 hereof, [National Cement] is not otherwise granted an exclusive right to use [the] facilities . . . Nowhere does the agreement give National Cement exclusive possession of the wharf or the facilities. Nowhere is it described as a lease or sublease; nor does it purport to pass an interest in land, even in the language quoted by Wilmington. It specifically provides that National Cement would have no title to or interest in the facility. The National Cement complaint alleged that
 
 Wilmington
 
 was going to operate it as a “dry bulk commodities facility,” and there are no allegations which indicate that a landlord-tenant relationship was intended, or even contemplated. Under such circumstances, the agreement appears to grant a license, not a lease, and a license is not an interest in real property. (See
 
 O’Shea
 
 v.
 
 Claude C. Wood Co.
 
 (1979) 97
 
 *198
 
 Cal.App.3d 903, 909-910 [159 Cal.Rptr. 125], abrogated by statute on another point; see
 
 Hubbard
 
 v.
 
 Brown
 
 (1990) 50 Cal.3d 189, 194-195 [266 Cal.Rptr. 491, 785 P.2d 1183].) If the facts alleged amount to a loss of use of property, it was a loss of use of the insured’s own property, not the property of others. Under the plain meaning of the words of the policy as applied to the facts of this case, there was no property damage coverage here.
 

 Since the examination of the National Cement pleadings and the language of the policies reveal no potential for coverage, Somerset and Wilton acted properly in refusing to defend or indemnify Wilmington. (See
 
 Waller
 
 v.
 
 Truck Ins. Exchange, Inc., supra,
 
 11 Cal.4th at pp. 26, 37;
 
 Gray
 
 v.
 
 Zurich Insurance Co., supra,
 
 65 Cal.2d at p. 276.) We need not reach Wilmington’s remaining issues.
 
 [4]
 

 Disposition
 

 The judgment is affirmed. Respondents shall recover their costs.
 

 Klein, P. J., and Kitching, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied May 21, 1997. Mosk, J., was of the opinion that the petition should be granted.
 

 [1]
 

 Defendants are two groups of affiliated insurance companies. We will refer to one as the “Somerset” and the other group as “Wilton” for convenience.
 

 [2]
 

 The contract was originally between Wilmington and General Portland, Inc., and later assigned to National Cement.
 

 [3]
 

 The term, “personal injury” refers not to the injury or damage to a person, but to the type of offense, as defined by the policy. (See
 
 General Accident Ins. Co.
 
 v.
 
 West American Ins. Co.
 
 (1996) 42 Cal.App.4th 95, 102 [49 Cal.Rptr.2d 603].)
 

 [4]
 

 Wilmington raised the following additional issues: whether coverage was triggered by an offense rather than an occurrence; whether there was a duty to indemnify in the amount of its settlement with National Cement; the requirement of proving bad faith; the enforceability of a stipulated judgment with an agreement not to execute; the effect of the mediator’s opinion as proof of damages; the requirement of giving notice of a claim of bad faith; and whether it had raised a triable issue of fact as to bad faith.