**UNITED STATES FIDELITY AND GUARANTY COMPANY,**
Plaintiff,

v.

**B & B OIL WELL SERVICE, INC., Defendant.**

**Civil A. No. 4:94–CV–12(L)(N).**

United States District Court,
S.D. Mississippi,
Eastern Division.

June 12, 1995.

Robert C. Galloway, Galloway & Galloway, Gulfport, MS, S. Wayne Easterling, Hattiesburg, MS, Frank Winston, Jr., Wiley, Rein & Fielding, Washington, DC, for plaintiff.

Kenna L. Mansfield, Jr., Wells, Wells, Marble & Hurst, Jackson, MS, for defendant.

TOM S. LEE, District Judge.

## MEMORANDUM OPINION AND ORDER

Beginning in 1985, plaintiff United States Fidelity and Guaranty Company (USF & G)

issued successive commercial general liability policies to defendant B & B Oil Well Service, Inc. (B & B). The policies covered the period commencing December 1985 and extending through December 1992. In the spring and summer of 1994, a number of landowners on whose properties oil and gas wells were situated filed lawsuits against B & B and a number of other defendants charging that as a consequence of the activities of the defendants in connection with the oil and gas operations, their properties had become contaminated with what has become known as "naturally occurring radioactive material," or NORM. USF & G agreed to defend B & B in those lawsuits under a reservation of rights, and filed the present action seeking a declaratory judgment that under the contracts of insurance issued to B & B, it has no indemnity or defense obligations to B & B in connection with any claims or lawsuits involving damage caused by or related to NORM.

USF & G has now moved for summary judgment, contending that each of the subject insurance contracts contains either an "absolute pollution exclusion" or a "qualified" pollution exclusion which bars coverage for NORM-related claims or lawsuits as a matter of law. B & B has responded in opposition to USF & G's motion and has filed its own cross-motion for summary judgment seeking a declaration that USF & G has a duty to defend *and* indemnify it in connection with the landowners' lawsuits, and requesting, alternatively, partial summary judgment declaring that USF & G has a duty to defend B & B. After much deliberation, the court concludes that the policies do not provide coverage for the claims asserted against B & B in the underlying actions and the court will therefore grant USF & G's motion. However, the court recognizes that many of the issues presented by this case are the subject of judicial debate and that many close questions are presented. Accordingly, in an effort to be comprehensive, the court herein

has undertaken to address all of the issues which the parties have submitted for consideration and not merely those it deems dispositive.

■ Whether an insurer has an obligation to defend its policyholder is typically determined by measuring the allegations of the underlying complaint against the coverage provided by the policy. *Equal Employment Opportunity Comm'n v. Southern Publishing Co., Inc.,* 894 F.2d 785 (5th Cir.1990).

> An insurer's duty to defend an action is measured in the first instance by the allegations in the plaintiff's pleadings, and if such pleadings state facts bringing the injury within the coverage of the policy, the insurer must defend, irrespective of the insured's ultimate liability to the plaintiff.

7A Appleman, *Insurance Law & Practice* § 4683 (1962). An insurer is obligated to defend an insured not only when the suit is within the coverage afforded by the policy, but also when the allegations of the suit state a claim or facts that are potentially within the policy's coverage, *Merchants Co. v. American Motorists Ins. Co.,* 794 F.Supp. 611, 616 (S.D.Miss.1992); thus, if there is any basis for potential liability under the policy, the insurer is bound to defend. *Id.* at 617. And any doubt as to the existence of a defense obligation is resolved in favor of the insured. *Rhodes v. Chicago Ins. Co.,* 719 F.2d 116 (5th Cir.1983). Therefore, to ascertain whether USF & G has a duty to defend B & B in any of the underlying lawsuits, the court must examine each of the claims asserted in each of the complaints against B & B and the pertinent policy provisions to determine whether any claim or claims in a given case fall within the coverage of USF & G's policy.

### THE UNDERLYING LAWSUITS

In each of twelve underlying lawsuits,[1] the landowner plaintiffs allege that an oil compa-

---

1. B & B is a defendant in ten actions that have been filed in the Circuit Court of Jasper County:

 *James v. Chevron USA, Inc., et al.,* No. 2081;
 *McDonald v. FINA Oil Co., et al.,* No. 2083;
 *Robinson v. Petrofina Delaware, Inc., et al.,* No. 940004

 *Jennings v. Anderman/Smith Operating Co., et al.,* No. 94–0006;
 *Ramey v. Amex Co., et al.,* No. 94–0–013;
 *Hendry v. Anderman/Smith Operating Co., et al.,* No. 94–0014;
 *Wes Hendry v. Anderman/Smith Operating Co., et al.,* No. 94–0016;

ny or companies located oil and gas wells, and in some cases salt water disposal wells, on plaintiffs' properties pursuant to lease agreements, and that during the operation of these wells, the equipment on plaintiffs' properties became contaminated with NORM, causing plaintiffs' properties, in turn, to become NORM-contaminated. Regarding B & B, the plaintiffs in three of the cases, *James, McDonald* and *Robinson,* allege:

> [U]pon information and belief the Defendant[ ], B & B at various times performed workovers on said oilwell. That during the workover operations the rods and/or tubing were pulled from said well causing rust, scale, salt water, and sediments from deep within the earth to fall upon the oil well location. That said Defendant[ ], well service compan[y], either knew or should have known that NORM materials were contained in the rust, scale, salt water, and sediments which were deposited on the well site. That neither said Defendant[ ] nor Chevron, the operator of the well, made any effort to clean up the NORM materials from the site.

The complaints in *Jennings, Ramey, David Van Hendry, Wes Hendry, Morgan, Brown, Ball, Ruffin* and *Easterling* are virtually identical to one another and, as they pertain to B & B, are substantively similar to those in *James, McDonald* and *Robinson.* In each of these cases, the plaintiffs aver that they are the owners of properties on which variously named oil company defendants have located, owned and/or operated oil well facilities. They allege that during the operation of these wells, the equipment, as well as plaintiffs' properties, has become contaminated by NORM. Regarding B & B, these plaintiffs allege:

> That from time to time, the Defendant [well operators] retained and hired the Defendant[ ] ... B & B to do certain construction/workover work on the well and

well site. Plaintiffs affirmatively allege that at all times pertinent hereto the Defendant[ ] ... B & B, their employees, agents, and servants were acting as agents and servants for their master, [the well operators], and were in the course and scope of their employment.[2]

They further allege:

> That [B & B] repaired, and performed workover operations on the well[s] and its appurtenances in such a manner as to cause the well site[s] and [their] appurtenances including Plaintiff[s'] real property to be contaminated with radioactive materials at a time when the Defendants and all of them knew or should have known that the manner in which they were conducting the work would result in radiation contamination of Plaintiff[s'] property.

The plaintiffs in all of the cases charge that B & B, as well as each of the other defendants, "knew, or in the exercise of reasonable diligence, should have known that the materials presented an environmental hazard and would cause damage to others, particularly your complaining Plaintiff." And they charged that "each of the Defendants" breached "one or more of the following duties" to them:

> duty to test, duty to warn, duty to use less hazardous technology, duty to provide care for Plaintiff, and duty to clean up the radioactive waste.

Finally, each of the landowners complains that the NORM contamination of their property constitutes an ongoing nuisance that has trespassed on plaintiffs' property to the injury of the plaintiffs.

### THE COVERAGE

#### I. Bodily Injury and Property Damage Coverage

The coverage provided by the policies is set forth in Section 1, and under the heading

---

*Morgan v. Chevron USA, Inc., et al.,* No. 94–0032;

*Brown v. American Exploration Co., et al.,* No. 94–0037; and

*Ball v. Chevron USA, Inc., et al.,* No. 94–0041. Additionally, it is a named defendant in two Smith County Circuit Court actions:

*A.L. Easterling, Jr. v. Chevron USA, Inc., et al.,* No. 94–0187;

*Ruffin v. COHO Resources, Inc., et al.,* No. 94–0205.

**2.** In *Brown, Ruffin* and *Easterling,* the plaintiffs alleged "additional [sic] that ... B & B's actions constituted independent torts, for which Plaintiffs are entitled to recover."

"Coverage A. Bodily Injury and Property Damage Liability," the following appears:

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.... The "bodily injury" or "property damage" must be caused by an "occurrence". We will have the right and duty to defend any "suit" seeking those damages.

"Occurrence" is defined as "an accident, including repeated exposure to substantially the same general harmful conditions."

The landowner plaintiffs charge that they have been continuously and repeatedly exposed to NORM contamination as a result of which they have or will sustain bodily injury, and that their property has been damaged or "rendered useless" as a consequence of NORM contamination. For purposes of this motion, USF & G concedes that such allegations fall within these insuring provisions. The primary question which the parties have submitted for the court's consideration is whether the claims are excluded from this coverage by exclusionary provisions in the policies.

### The "Absolute" Pollution Exclusion

A number of the policies issued by USF & G to B & B contain what USF & G terms, and what other courts have termed an "absolute" pollution exclusion, which applies to the bodily injury and property damage coverage. This exclusion provides:

This insurance does not apply to:

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

(d) At or from any site or location on which you or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations.[3]

The term "pollutants" is defined as:

any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.[4]

■ Initially, the court observes that B & B does not dispute that this exclusion is valid and enforceable. And it agrees that some of the underlying claims are for bodily injury and property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of NORM, which the court concludes is a pollutant within the meaning of the exclusion.[5] However, whereas USF & G argues that each part of this exclusion

---

3. Subsection (1)(d) of the policy itself actually states:

 (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:
 (i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or
 (ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

 However, an endorsement to the policy entitled, "EXCLUSION—OIL AND GAS PRODUCING OPERATIONS," substituted for this language the language quoted in the text.

4. Certain of the policies contained an absolute pollution exclusion that is slightly different from that quoted in the text. The differences, however, are inconsequential for purposes of the present motion.

5. In its brief, B & B says it does not concede that NORM is a pollutant. The court, however, has no difficulty in concluding that NORM is, in fact, a pollutant within the policy's definition of that term.

clearly applies to bar coverage, B & B maintains that none applies.

 *Subsection (a):* Subsection (a), quoted above, excludes coverage, without reference to *when* the discharge occurred or to *who* caused the discharge,[6] only if B & B "occupied" the premises. The sole question for purposes of determining the applicability of subsection (a), then, is whether B & B ever "occupied" the premises of these plaintiffs. B & B maintains that since it "only occasionally entered the property for the limited purpose of performing workover operations on the wells, and did so at the invitation of the well operators," it never "occupied" any of the plaintiffs' properties within the contemplation of this exclusion. USF & G asserts, though, that the fact that B & B performed work at the well sites is all that is required for it to have "occupied" the properties. In support of its position, USF & G relies primarily on *Tri County Service Co., Inc. v. Nationwide Mutual Insurance Co.*, 873 S.W.2d 719, 722 (Tex.Ct. App.1993), wherein the court held that "a contractor or subcontractor ... can 'occupy' a site without owning or holding any other property interest in the premises." This court is in complete accord; one need not have an ownership interest in property in order to be considered an occupant of the property. That, however, does not resolve the issue with which the court is confronted: Does occasional, limited work performed by a subcontractor, such as B & B, at a well site operated and controlled by another amount to occupancy? In the court's opinion, the answer to this question must be no. As one court has aptly observed, if any sort of occupancy, "no matter how transitory or for whatever purpose," were deemed sufficient to invoke subsection (a) of this pollution exclusion, "the remaining subsections, (b) through (d), would be meaninglessly superfluous." *Schumann v. New York,* 160 Misc.2d 802, 610 N.Y.S.2d 987 (Ct.Cl.1994).

The court's conclusion in this regard is not altered by *Gregory v. Tennessee Gas Pipeline Co.,* 948 F.2d 203 (5th Cir.1991), which both parties cite to support their positions. In *Gregory,* the court held that the City of Natchitoches, Louisiana, which created a reservoir, and held and used it for a water supply and recreational facility, thereby occupied the reservoir. In so holding, the court, citing Black's Law Dictionary 1231 (4th ed. 1968), observed that "[t]o occupy something is to hold or keep for use." *Gregory,* 948 F.2d at 207. Citing *Gregory,* B & B argues that since it did not "hold or keep [the landowners' properties] for use," and had no possessory interest in the properties, then it never "occupied" the properties in accordance with the Fifth Circuit's apparent comprehension of that term. USF & G asserts, though, that the point of *Gregory* was merely that one who does, in fact, "hold or maintain property for use," also "occupies" it; it does not follow, USF & G continues, that one who does not "hold or maintain property for use" does not "occupy" it. USF & G further notes that Black's Law Dictionary, cited in *Gregory,* includes in its definition of "occupy" the following:

> [t]o take or enter upon possession of; to hold possession of; ... to possess; to tenant; *to do business in;* to take or hold possession. *Actual use,* possession and cultivation.

*Black's Law Dictionary* 974 (5th ed. 1979) (emphasis added). It then argues that B & B was doing business at these sites and actually using the properties. In the court's view, however, each aspect of the "occupancy" definition suggests something other than a transient, nonpossessory relation to the property.[7] Subsection (a) is thus inapplicable. This brings the court to subsection (b).

---

6. Manifestly, B & B did not own or rent the property, nor was the property "loaned to" B & B. The only other requirement for invoking this exclusionary provision is occupancy of the premises.

7. Take, for example, the case of a plumber who is called to a business establishment to perform some manner of plumbing service; certainly, during the time he is required to be at that location, be it a day or a week, he is doing business at that location, i.e., performing plumbing services, and is in some sense actually using the premises to perform his work. Yet no one could reasonably contend that the plumber "occupied" the premises, just as no one could contend that a telephone repairman, while working on a customer's telephone, "occupies" the customer's residence.

■ **Subsection (b):** In order for subsection (b) to apply, the discharge, release or escape of pollutants or contaminants must occur "at or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste." According to USF & G, subsection (b) applies to the claims in the landowners' lawsuits since "the underlying claims allege that B & B handled and disposed of these materials on plaintiffs' property." This is not an entirely accurate characterization of the underlying complaints. As set forth above, the plaintiffs in some of these cases have alleged that B & B, during its workover operations, pulled rods and/or tubing from the wells, "causing rust, scale, salt water, and sediments from deep within the earth to fall upon the oil well location." In other cases, they allege that B & B's repair work and workover operations on the wells were performed in such a way as to "cause the well site[s] and ... Plaintiff[s'] real property to be contaminated with radioactive materials." These allegations are not necessarily read as charging that the plaintiffs' properties were used by B & B for the "handling, storage, disposal, processing or treatment of waste." That is, contrary to USF & G's position, none of the plaintiffs in the underlying lawsuits has charged that B & B used his property for the handling, treatment and/or disposal of waste. That, however, does not end the court's inquiry for subsection (b) applies not only if an *insured* has used the premises for handling or disposing of waste, but by its clear terms excludes coverage if others have done so.

■ In two of the underlying lawsuits, *James* and *Easterling,* the plaintiffs have charged that defendants other than B & B hauled NORM-contaminants to their properties and left them there. Whether this amounts to the disposal or storage of "waste" within the meaning of subsection (b) requires a closer examination of the specific allega-tions in those cases. As the court has already indicated, two of the *Easterling* plaintiffs, John and Jane Parker, charge that Chevron used their property as a "radioactive dumpsite" for radioactive materials brought from other well sites, including dirt, scale, sludge, clothing, pipe, and other radioactive materials, and they allege that another defendant, Russell's Roustabout, "deposit[ed] drums of NORM contaminants" on their property. Subsection (b) will apply to exclude coverage for the Parkers' claims premised on these allegations.[8]

■ In another of the underlying lawsuits, *James,* the plaintiff alleges that Russell's Roustabout hauled tank bottoms and heater treater bottoms which contained high levels of NORM radiation from other Chevron-operated oil fields and dumped them on her property. James alleges that Russell's, and all the other defendants, knew or should have known that these materials were NORM-contaminated and presented an environmental hazard. James' allegations in this regard are not as obviously covered by subsection (b) as are the Parkers' allegations. In the court's opinion, James' allegations do not necessarily place her claim against B & B within this exclusion.

Subsection (b) applies only if the property was used "for the handling, storage [or] disposal ... of waste." This language can reasonably be read as requiring that the property be used *for the purpose of* handling, storing or disposing of waste. In the court's opinion, therefore, the exclusion would not apply if the handling or disposal of waste is merely incidental to the purpose for which the insured or others used the premises and is not done intentionally for the purposes listed in the exclusion.

James has not alleged that Russell's objective in "dumping" the equipment on her property was to dispose of or store the equipment because it was NORM-contaminated, though that is possibly what she in-

---

**8.** B & B has not challenged USF & G's assertion that NORM constitutes "waste." Indeed, *Webster's Third New International Dictionary,* at 2580, defines "waste" as "damaged, defective, or superfluous material produced during or left over from a manufacturing process or industrial operation: material not usable for the ordinary or main purpose of manufacture: as ... worthless material removed in mining and digging operations." NORM would appear to qualify as waste under this definition of the term.

tended; on the other hand, though, she could mean only that as a consequence of Russell's having left equipment on her property which happened to have been NORM-contaminated, her property has become contaminated. In the latter case, the exclusion would not appear applicable. Moreover, the exclusion expressly applies only to the disposal and storage of "waste;" it appears unlikely that this equipment would qualify as "waste." That is, whereas NORM-contaminated "dirt, scale, sludge" and the like may be properly characterized as "waste," this equipment does not fall so readily into that category, and surely would not if it was intended that the equipment was to be used again. In sum, therefore, James' allegations do not plainly place that claim within subsection (b) of this pollution exclusion.

In addition to her claim that Russell dumped contaminated equipment on her property, James has also alleged that "Chevron left behind, scattered about the property, discarded tanks, pipes, fittings, concrete foundations and other items of equipment contaminated with radioactivity." If this assertion amounted to a charge that Chevron "stored" or "disposed of" these items as "waste," subsection (b) would be invoked. However, it again is not clear that this is the proper reading to be given James' pleading. James does charge that Chevron "discarded and abandoned" these items upon her property; but she also alleges that Chevron, when the well on her property stopped producing oil, chose not to plug and abandon the well but instead decided to hold it for future use. This allegation suggests the possibility that Chevron's purpose in leaving these items on the property was not to abandon or discard them, but rather to set them aside for future use and that it was not its intention to treat these items as "waste." Consequently, it cannot be said definitively that subsection (b) excludes coverage.

 *Subsection (c):* Coverage under the USF & G policies is excluded under subsection (c) of the absolute pollution exclusion for the discharge, release or escape of pollutants that were "transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible." B & B argues against applicability of this language for the reason that there is no allegation in any of the underlying lawsuits that it ever hauled to and dumped NORM-containing materials at the sites. However, the applicability of subsection (c) is not limited to the activities of B & B; rather, it extends to the activities of "any person or organization for whom [B & B] may be legally responsible."[9] USF & G submits that because the plaintiffs in each of the underlying lawsuits seek to hold B & B jointly and severally liable with its co-defendants for the alleged actions of each and all of those defendants, then B & B is "legally responsible" for the activities of each of those co-defendants. The court, however, is not persuaded that the language of this exclusion contemplates joint and several liability as a basis for its applicability, since joint and several liability is not so much a concept of "legal responsibility" as it is a concept of damages apportionment. As one court has explained:

> An allegation of joint and several liability relates to the apportionment of damages once a party has been found liable; it does not raise the potential for liability in the first instance, absent specific allegations of liability against a party.

*Staefa Control–Sys. v. St. Paul Fire & Marine Ins. Co.,* 847 F.Supp. 1460, 1471 (N.D.Cal.1994). There is no allegation in the underlying suits that B & B may be held liable based on the conduct of another defendant in the sense that it could be held liable on the basis of such other defendant's actions or inactions. The court therefore concludes that coverage under these policies is not excluded by virtue of subsection (c) of the absolute pollution exclusion.

---

9. In its memorandum brief, USF & G states that the underlying plaintiffs have alleged that B & B disposed of various NORM-containing materials on their property, and that NORM-containing materials were hauled to and dumped at the sites by others. While the latter characterization is accurate, the former is not. Not one of the plaintiffs in the underlying lawsuits has alleged that B & B disposed of NORM on his property.

■ *Subsection (d):* Subsection (d) excludes coverage for bodily injury or property damage arising out of the discharge, dispersal, release or escape of pollutants at any location on which the insured or any contractors or subcontractors working on any insured's behalf "are performing operations." To the extent that the underlying lawsuits seek to predicate B & B's liability on a discharge, dispersal, release or escape of pollutants that occurred while B & B was performing operations on the subject properties, this provision clearly and unambiguously excludes coverage. Yet B & B claims that it is being sued not only for its own actions in relation to the wells, but also for the acts and omissions of others that occurred before it began performing operations on the premises. In other words, it contends that while it *should* not be held liable for prior discharges, such allegations are made nonetheless so that it could conceivably be held liable to the landowners for NORM contamination caused by others at a time when it was not performing operations on their properties. Indeed, the complaints do allege that B & B failed to detect and warn of the risks from NORM contamination and failed to clean up the properties; and these allegations could conceivably be interpreted to relate to actions by others prior to the time B & B began performing operations on the properties. However, in the court's opinion, this part of the pollution exclusion applies because any liability B & B may have would be properly attributable only to that period of time during which it as performing operations at the underlying sites. Accordingly, the court finds that USF & G has no duty to defend or indemnify B & B in connection with the underlying lawsuits.

### The "Qualified" Pollution Exclusion

■ The USF & G policies issued to B & B which do not contain an absolute pollution exclusion contain another pollution exclusion, a "qualified" pollution exclusion, which excludes coverage for:

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acid, alkalis, toxic chemicals, liquids or gasses, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

The parties' arguments relating to this pollution exclusion focus on the "sudden and accidental" exception to the exclusion. That is likely because the underlying lawsuits obviously charge that discharges or releases of pollutants caused them to suffer bodily injury and property damage. The determinative issue, then, is whether any alleged discharge was "sudden and accidental."

Though the general rule is that the insurer bears the burden of proof on the applicability of exclusionary provisions, such as pollution exclusions, most courts have held that the burden is on the insured to prove that the sudden and accidental exception in the qualified pollution exclusion applies. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.,* 26 F.3d 1195, 1199–1200 (1st Cir.1994) (holding that "the *insured* bears the burden of establishing that an exception to a pollution exclusion has been satisfied."); *Aeroquip Corp. v. Aetna Casualty & Sur. Co.,* 26 F.3d 893, 895 (9th Cir.1994) ("The 'sudden and accidental' exception creates coverage where it would otherwise not exist and thus the insured's burden of proving coverage extends to proof of this exception."). *But see New Castle County v. Hartford Accident & Indem. Co.,* 933 F.2d 1162, 1181–82 (3d Cir.1991), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993); *United States Fidelity & Guar. Co. v. Morrison Grain Co.,* 734 F.Supp. 437 (D.Kan.1990), *aff'd,* 999 F.2d 489 (10th Cir.1993). In this case, the court concludes that regardless of which party bears the burden of proof, the landowners' claims against B & B fall outside of coverage.

■ The plaintiffs in each of the underlying lawsuits allege that at all relevant times, B & B, as well as others who performed services on the wells located on the subject properties, knew or should have known that their activities were causing plaintiffs' properties to become contaminated with NORM, and furthermore, that each of the defendants

knew or should have known of the dangerous propensities of NORM. These allegations place their claims directly within this qualified pollution exclusion, for if B & B and others working at the well sites in fact knew they were contaminating the properties, then there would be no possible basis for concluding that the discharges and damage caused thereby were "accidental." However, the inquiry whether a duty to defend arises is not limited to the underlying third-party complaints; if the insurer knows of facts which, if proven, would result in coverage under its policy, then its duty to defend is not discharged merely because the facts alleged in the underlying lawsuits appear to locate the claims outside of coverage or within an exclusion. *See Merchants Co. v. American Motorists, Inc.,* 794 F.Supp. 611, 617 (S.D.Miss. 1992) (duty to defend determined not only from language of complaint but also from independent facts of which insurer is made aware or becomes aware that create potential of coverage). In this vein, B & B argues, contrary to the plaintiffs' allegations in the third-party actions, that it had no knowledge that any of its own activities, or the activities of others, was causing or could cause the discharge or release of NORM contaminants on the plaintiffs' properties since during all relevant times, it did not even know that NORM existed. It claims, therefore, that any discharge or release of NORM contaminants was obviously unexpected and unintended and thus, must be deemed "sudden and accidental." [10] That is, if it did not know about the existence of NORM, it could not possibly have intended to discharge or release NORM contaminants on the plaintiffs' properties.

Even assuming that B & B were to ultimately prove that it was unaware of the existence of NORM when the complained-of actions were taken, that fact still would not except the landowners' claims from the qualified pollution exclusion. Most courts agree that where there has been a discharge or release of contaminants, the fact that an insured did not intend the *damages* that arose from such discharge or release does not alter the applicability of the exclusion. That is, the fact that the damages were unexpected or unintended is not material in determining the applicability of this pollution exclusion. *See, e.g., United States Fidelity & Guar. Co. v. T.K. Stanley, Inc.,* 764 F.Supp. 81, 83, 84 n. 4 (S.D.Miss.1991) (an interpretation of phrase "sudden and accidental" which focuses on the damages, rather than the act that caused the damage, is at odds with the express language of the exclusion). This view is in keeping with the clear language of the exclusion, which makes the sudden and accidental exception applicable only if "the *discharge, dispersal, release or escape* is sudden and accidental;" the exception is not implicated merely because the damages may have been accidental, in the sense that they were unexpected or unintended. What is relevant is whether the insured expected or intended the discharge or release.

In this same vein, the fact that the insured may not have known and may not have expected or intended that its discharge contain "smoke, vapors, soot, fumes, acid, alkalis, toxic chemicals, liquids or gasses, waste materials or other irritants, contaminants or pollutants" is immaterial. *See St. Paul Fire and Marine Ins. Co. v. Warwick Dyeing Corp.,* 26 F.3d 1195, 1203 n. 5 (1st Cir.1994) ("[I]t is not relevant whether or not Warwick actually knew that its waste materials contained hazardous substances.... The exclusion bars coverage so long as the discharge of 'waste materials' was expected and intended and as long as the property damage is 'arising out of' this discharge."); *New Castle County v. Hartford Accident & Indem. Co.,*

---

**10.** B & B equates both terms, "sudden" and "accidental," with unexpected or unintended. Though many issues as to this qualified pollution exclusion, and pollution exclusions in general, are the subject of debate, the most controversial issue concerns the meaning attributable to the word "sudden" in the phrase "sudden and accidental." Some courts considering the issue have concluded that the term "sudden" means "unexpected" or "unintended," whereas others have attributed to the term a requirement that the discharge have a temporal quality about it, i.e., "abrupt." However, since the exception applies only if the discharge was both sudden *and* accidental, and since the court concludes that the discharges were not "accidental," it follows that the exception does not apply and the court need not consider whether the discharges were also sudden.

970 F.2d 1267, 1270 (3d Cir.1992) (rejecting argument that coverage was reactivated by pollution exclusion exception under circumstances where insured, at the time of its discharge, did not know that the substance it was discharging was a contaminant; the discharge, though "innocent," was excluded because it was "intentional"); *Hartford Accident & Indem. Co. v. United States Fidelity & Guar. Co.*, 962 F.2d 1484, 1491 (10th Cir.), *cert. denied,* 506 U.S. 955, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992) (applying exclusion despite insured's unawareness that the lubricating oil which it discharged into disposal pits contained hazardous PCBs, explaining that "it is the discharge which must be sudden and accidental to qualify for coverage, not the pollution damage"); *Bureau of Engraving v. Federal Ins. Co.*, 793 F.Supp. 209, 212 (D.Minn.1992), *aff'd,* 5 F.3d 1175 (8th Cir. 1993) (in response to insured's argument that it did not know that substances it disposed of were hazardous, court said, "The exclusion does not require, however, that the Bureau know that the substances are hazardous."); *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, 842 F.Supp. 575, 584 (D.D.C.1994) (where the discharge of the oil was intentional, the exclusion applied despite the insured's unawareness that there was dioxin, a pollutant, in the oil). For the reasons cited in the foregoing cases, this court is of the opinion that B & B's lack of knowledge of NORM, if it indeed lacked such knowledge, is not a basis for invoking the "sudden and accidental" exception. Moreover, while it is possible that the discharges were unintentional, the court perceives in the parties' submissions no basis for concluding they were unexpected. The court recognizes that many of the underlying complaints, as framed, are rather vague about how NORM contamination occurs, or is alleged to have occurred in this case. Little, if any detail is provided by their factual allegations. But there is no intimation in the complaint or otherwise that anything out of the ordinary, or "unexpected" occurred in the course of B & B's operations, or the operations of others[11] in relation to the well. Indeed, it appears that the only circumstance which differentiates the operations on the wells involved in these cases from the operations on other wells is that the operations on these wells allegedly resulted in NORM contamination of the properties.

## II. Personal Injury Coverage

■ Under Coverage B of its policies, the personal injury coverage, USF & G agreed to pay "those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' ... to which this coverage part applies," and to defend against suits seeking damages on account of such "personal" injury. All of the policies limit the definition of "personal injury" to injury, other than bodily injury, arising out of certain enumerated offenses which each policy, depending on its date of issue, variously describes as including, *inter alia:*

> Wrongful entry or eviction or other invasion of the right of private occupancy.

> Wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies.[12]

The landowners in each of the underlying lawsuits complain that the NORM contamination of their properties constitutes "an ongoing nuisance that has trespassed on plaintiffs' property to the injury of the plaintiffs," and which has caused plaintiffs to be damaged "relative to [their] property values and rights." B & B submits that these allegations are tantamount to a claim for "wrongful entry or eviction," or at least an "other invasion of the right of private occupancy" of the subject properties such that those underlying claims fall within the personal injury coverage of the policies. USF & G, on the other

---

**11.** By its terms, this provision extends to exclude claims for bodily injury or property damage caused by the discharge or release of pollutants without reference to the source of the release of discharge. That is, the exclusion is not limited to discharges or releases by B & B.

**12.** In its more recent policies, USF & G has used the following language:

> The wrongful eviction from, wrongful entry into or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor.

The court considers it rather obvious that none of the claims in the underlying actions could qualify for coverage under this definition.

hand, argues that in accordance with any reasonable construction of the policy, it must be concluded that the landowners' claims in the underlying lawsuits are not for personal injury but are plainly for property damage, and thus subject to the pollution exclusion.

The question of whether such claims as those alleged in the underlying lawsuits are covered, or potentially covered, by personal injury coverages similar to or identical to that contained in the USF & G policies, has generated conflicting authorities. A number of rationales have been used by the courts both to find and reject such coverage. Of those that have concluded there exists no potential for coverage of such claims, some have reasoned that the definition of "personal injury" which includes "wrongful entry" and/or "other invasion of the right of private occupancy" does not extend to all interferences with "occupancy," such as interference with one's quiet enjoyment of his property, but rather requires an interference with an occupant's right to actually *possess* the property. *See, e.g., Staefa Control–Sys. v. St. Paul Fire & Marine Ins. Co.,* 847 F.Supp. 1460, 1474 (N.D.Cal.1994) (finding "dispositive" insurer's argument that policy provided coverage only for interference with the right to possess property, not the mere physical invasion of that property); *W.H. Breshears, Inc. v. Federated Mut. Ins. Co.,* 832 F.Supp. 288, 291 (E.D.Cal.1993) (rejecting insured's claim that third-party lawsuits against it alleging trespass, nuisance and strict liability were covered under the personal injury portion of the policy since torts of wrongful entry and wrongful eviction, in contrast to torts of trespass and public and private nuisance, involve claim by one person over another to occupancy of property); *Decorative Ctr. of Houston v. Employers Casualty Co.,* 833 S.W.2d 257, 261–62 (Tex.Ct.App.1992) (these offenses "are meant to cover only landlord-tenant situations, or, if extended, only similar instances where the defendant insured has some superior right to occupancy to that of the plaintiff"); *Morton Thiokol, Inc. v. General Accident Ins. Co. of America,* No. C–3956–85 (Sup.Ct.N.J. Aug. 27, 1987) (wrongful entry, eviction and occupancy all have to do with the possession of property; the seepage of toxic waste has nothing at all

to do with the possession of property so the personal injury clause does not provide coverage to claims of nuisance and trespass). Some have found that the enumerated torts require an *intentional* interference with another's property rights. *See Gregory v. Tennessee Gas Pipeline Co.,* 948 F.2d 203, 209 (5th Cir.1991) (risks enumerated by personal injury coverage require intentional conduct by the insured); *East Quincy Services Dist. v. Continental Ins. Co.,* 864 F.Supp. 976, 981 (E.D.Cal.1994) (claims relating to property contamination did not potentially fall within policy's personal injury coverage since "damages from pollution do not amount to the kind of wrongful entry or eviction envisioned by the policy language relating to intentional torts particularly when viewed in light of the pollution exclusion"). Additionally, many courts have concluded that in order to give effect to pollution exclusions in these policies, claims by third parties stemming from contamination damage to their property, regardless of the theories asserted for recovery, must be classified as "property damage," which claims are thus subject to whatever pollution exclusion applies to the property damage coverage of the policy under consideration. *See Gregory,* 948 F.2d at 209 (to extend personal injury coverage to property damages that would be covered under property damage of Coverage A would render pollution exclusion meaningless); *County of Columbia v. Continental Ins. Co.,* 83 N.Y.2d 618, 612 N.Y.S.2d 345, 634 N.E.2d 946 (1994) (allegations that property damage resulting from leaching of toxic chemicals constituted continuing nuisance and continuing trespass that has put plaintiff out of its own property were not covered by personal injury endorsement; "[I]t would be illogical to conclude that the claims fail because of the pollution exclusion while also concluding that the insurer wrote a personal injury endorsement to cover the same eventuality."); *Titan Corp. v. Aetna Casualty & Sur. Co.,* 22 Cal.App.4th 457, 27 Cal.Rptr.2d 476, 486 (1994) (interpreting clause "other invasion of the right to private occupancy" to "limit its coverage to injuries personal to the occupant, as distinct from the damage to the realty," since any other interpretation would "render the pollution exclusion meaningless"); *Staefa Con-*

*trol–Sys. v. St. Paul Fire & Marine Ins. Co.,* 847 F.Supp. 1460, 1474 (N.D.Cal.), *amended on reconsideration,* 875 F.Supp. 656 (N.D.Cal.1994) (claims for continuing trespass, private nuisance and public nuisance based on migration of pollutants onto property of adjacent landowner not within personal injury coverage; "[I]t is simply not objectively reasonable for an insured to expect that pollution damage specifically excluded from coverage by its property damage provision would be covered under its personal injury provision."); *O'Brien Energy Sys. v. American Employers' Ins. Co.,* 427 Pa.Super. 456, 629 A.2d 957, 964 (1993) (personal injury endorsement does not afford coverage for environmental damage claims based on migrating gases for which coverage is specifically excluded by pollution exclusion; "To hold otherwise would emasculate the clear and unambiguous provisions of the pollution exclusion and could not be justified except as an unwarranted straining to reach a result different than that intended by the parties.").

Other courts have rejected these rationales and concluded that personal injury coverage extends, or at least potentially extends, to claims such as those at issue here. *See Scottish Guarantee Ins. Co., Ltd. v. Dwyer,* 19 F.3d 307 (7th Cir.1994) (reasonable person in position of insured would have understood term "wrongful entry" to include unintentional trespass; thus, insurer had duty to defend); *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.,* 976 F.2d 1037 (7th Cir.1992) (allegation of chemical trespass constituted claim of "other invasion of the right to private occupancy;" while "eviction" requires intent to dispossess another of his property, "wrongful entry" and "other invasion of the right of private occupancy" do not); *Titan Holdings Syndicate, Inc. v. City of Keene,* 898 F.2d 265 (1st Cir.1990) (allegations that noxious odors, noise and light emanating from city's sewage plant unreasonably interfered with plaintiffs' use of their property stated claim for coverage for liability arising from an "other invasion of the right of private occupancy"); *Blackhawk–Central City Sanitation Dist. v. American Guarantee Liab. Ins. Co.,* 856 F.Supp. 584, 590 (D.Colo.1994) (insured had a duty to defend insured against claims of trespass and public and private nuisance by downstream property owners seeking to recover damages for their "personal injuries and property damages" caused by insured's discharge of pollutants into stream; "wrongful entry and eviction" do not necessarily require conduct designed to take possession of property, so allegation of interference with use and enjoyment of land caused by pollutants was sufficient to bring claims within coverage); *Gould, Inc. v. Arkwright Mut. Ins. Co.,* 829 F.Supp. 722, 729 (M.D.Pa.1993) (concluding that "the personal injury endorsement, with its coverage for 'wrongful entry' and 'other invasion of the right of private occupancy', [was], in the context of the entire policy, specifically, the pollution exclusion, clause, ambiguous," and, resolving that ambiguity in favor of the insured to the end that "the loss suffered by the Plaintiff potentially falls within the insured risk"); *Hirschberg v. Lumbermens Mutual Casualty,* 798 F.Supp. 600, 604 (N.D.Cal.1992) (quoting D. Faberstein & F. Stillman, *Insurance for the Commission of Intentional Torts,* 20 Hastings L.J. 1219, 1241 n. 96 (1969) ("invasion of the right of private occupancy" affords coverage for such matters as "interference with possession and enjoyment by means such as noise, leaky roofs, obstruction of access, obnoxious fumes ... actionable on a variety of theories such as ... nuisance or trespass"); *Harvard Indus. v. Aetna Casualty & Sur. Co.,* 273 N.J.Super. 467, 642 A.2d 438, 444 (1993) (a trespass, which consists of the unauthorized entry onto another's property, fits squarely within policy's definition of personal injury); *City of Edgerton v. General Cas. Co.,* 172 Wis.2d 518, 493 N.W.2d 768, 780–81 (App.1992) (offenses listed in personal injury definition do not require dispossession of landowner, and since pollution damage to property can constitute an invasion of another's private use and enjoyment of land, it is a personal injury liability covered by the policy).

There are appealing arguments on both sides of this issue. However, the court, after thorough review of the parties' memoranda and the cited authorities, concludes, particularly in light of the Fifth Circuit's opinion in *Gregory v. Tennessee Gas Pipeline Co.,* 948

F.2d 203 (5th Cir.1991), that there can be no "personal injury" coverage of the claims under consideration.

In *Gregory,* charges were made against the City of Natchitoches, Louisiana, that PCB contamination affected lands adjacent to a lake constructed and maintained by the City. The insured argued that these claims by the landowners came within the wrongful entry provision of the personal injury coverage. The Fifth Circuit first concluded that to find coverage of the claims under the guise of "personal injury" would be to effectively eviscerate the pollution exclusion for property damage. The court explained:

> The [district] court stated that to extend Coverage B to all property damages, including damages which would be covered under Coverage A, would render the pollution exclusion meaningless. This is correct. The risk of property damage caused by pollution, a risk which Titan expressly excluded and one for which the City paid no premium under Coverage A, would be subsumed under Coverage B.

948 F.2d at 209. The court further interpreted the coverage for personal injury to extend only to intentional conduct:

> Each of the enumerated risks specifically assumed requires active, intentional conduct by the insured. When viewed in the context in which they appear, the words "wrongful entry into, ... premises that the person occupies" do not afford coverage for the offense alleged in any complaint.

*Id.*

No one here disputes that under Mississippi law, one may incur liability for a negligent, or unintentional trespass, and that nuisance does not require intentional conduct. Yet in accordance with *Gregory,* to the extent that the plaintiffs in the underlying actions have alleged that their property has become NORM-contaminated as a consequence of the actions and/or inaction of B & B or others, there is no potential for coverage under the personal injury provisions of the policy. In *Gregory,* there were no allegations of intentional conduct by the insured; rather, it was alleged only that the City "knew of the pollution in the lake and failed to either clean it up or warn plaintiffs of the contamination."

*Id.* And because no coverage thus existed "under Coverage B for the wrongs asserted in any complaint," the court found it unnecessary to "attempt to harmonize the operation of the pollution exception under Coverage A with respect to the allegations of damage to plaintiffs' property from PCBs." *Id.* In this case, however, there are arguably allegations of intentional conduct against B & B. This court is ultimately persuaded by the reasoning of those courts which have found that an insured cannot reasonably expect coverage under "personal injury" coverage for property damage that is excluded from Coverage A. As one court cogently explained this point:

> [T]he law is clear that insurance provisions should be interpreted "in context, with regard to [their] intended function in the policy." Given the context of Coverage B, we feel that the personal injury provisions cannot reasonably be construed to cover property damage from pollutants. As the *Titan* court stated concerning a policy very similar to this one, "we must examine the language in context ... we do not believe it is objectively reasonable for an insured to expect 'personal injury' to mean 'property damage'." *Titan Corp. v. Aetna Casualty and Surety Co.,* 22 Cal.App.4th 457, 476, 27 Cal.Rptr.2d 476 (1994).

> While it is true that, by itself, "personal injury" could conceivably be construed ... to cover a spill like the one in this case, no reasonable insured could understand the personal injury section of [the] policy to cover pollution property damage. Such an interpretation would thereby nullify the effect of other clear provisions in the policy. We are persuaded that the Property Damage provision in Coverage A was clearly the only provision intended by the parties to govern claims involving injuries to land, and that provision expressly excluded damages from pollutants.

*W.H. Breshears, Inc. v. Federated Mut. Ins. Co.,* No. 93–15252, 38 F.3d 1219, 1994 WL 577258, 1994 U.S.App. LEXIS 29,245 (9th Cir. Oct. 17, 1994). Though *Gregory* did not finally resolve this issue, the inclination of the court on this issue appears consistent with the reasoning of *Breshears,* for the *Gregory* court did find "correct" the district

court's similar reasoning. For these reasons, the court rejects B & B's contention that certain of the claims in the landowners' suits invoke the policy's coverage of damages for personal injury.

## CONCLUSION

For the foregoing reasons, the court finds that coverage for the underlying lawsuits is excluded from the coverage of USF & G's policies. Accordingly, it is ordered that USF & G's motion for summary judgment is granted, and it is further ordered that B & B's cross-motion for summary judgment is denied.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.